ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
PAUL G. STERN (Cal. Bar # 162734)
Assistant U.S. Attorney
Senior Litigation Counsel, Criminal Division
AARON MAY (Cal. Bar # 207751)
Assistant U.S. Attorney
Major Frauds Section, Criminal Division
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-0715/0363
        Facsimile:  (213) 894-6269
        E-mail: paul.stern@usdoj.gov
                aaron.may@usdoj.gov

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. 11-1165(A)-PSG |
| | ) |
| Plaintiff, | ) **GOVERNMENT'S TRIAL MEMORANDUM** |
| | ) |
| v. | ) 18 U.S.C. §§ 371, 1512(k): |
| | ) Conspiracy to Obstruct Justice; |
| DAVID TAMMAN, | ) 18 U.S.C. §§ 1512(c)(2), 2(a): |
| | ) Aiding and Abetting Obstruction |
| Defendant. | ) of Justice; 18 U.S.C. § 1519: |
| | ) Destruction, Alteration and |
| | ) Falsification of Records; 18 |
| | ) U.S.C. § 3: Accessory After the |
| | ) Fact; 18 U.S.C. § 2(b): Causing |
| | ) An Act To Be Done |
| | ) |
| | ) Trial Date: October 30, 2012 |
| | ) Trial Date: 9:00 a.m. |
| | ) Ctrm.: Hon. Philip S. Gutierrez |
| | ) Roybal #880 |

        Plaintiff, United States of America, hereby submits its

trial memorandum in the above-captioned case.

//

//

//

//

**TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iv

I.    STATUS OF THE CASE.. . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY OF THE EVIDENCE. . . . . . . . . . . . . . . . . . 2

      A.    Overview of Defendant's Obstructive Conduct.. . . . . . 2

      B.    Co-defendant FARAHI's Underlying Investment Fraud.. . 7

      C.    Co-defendant FARAHI's Securities Violations.. . . . . 8

      D.    Defendant Altered NFS's PPM In 2004 To Help FARAHI
            Avoid Scrutiny From the National Association of
            Security Dealers. . . . . . . . . . . . . . . . . . . . 9

      E.    Defendant Left Liner in 2007 to Work at
            Nixon Peabody.. . . . . . . . . . . . . . . . . . . . 11

      F.    In the Fall of 2008, FARAHI Lost Over $20 Million
            and Began to Raise Money From Investors to Cover
            His Losses. . . . . . . . . . . . . . . . . . . . . . 12

      G.    "Loans to John Farahi" Was Added to the Draft PPM
            For The First Time on March 20, 2009. . . . . . . . 13

      H.    The SEC Conducted A Surprise Inspection On April 13,
            2009 Prompting Defendant To Backdate and Alter the
            PPM and Create a Backdated Promissory Note. . . . . 14

      I.    Defendant Lied to His Partner About The PPMs. . . . 16

      J.    FARAHI Disclosed to Defendant He Had Been Violating
            the Securities Laws and Defrauding Investors. . . . 17

      K.    Defendant and FARAHI Implement Their Obstruction
            Plan. . . . . . . . . . . . . . . . . . . . . . . . . 18

      L.    Defendant Made Further Alterations to the 2008/2009
            PPM On April 30, 2009.. . . . . . . . . . . . . . . . 20

      M.    On May 14, 2009, Defendant Altered the 2003 PPM to
            Add Loan and Other Disclosures. . . . . . . . . . . 21

      N.    Defendant and FARAHI Were Explicitly Told Not
            To Alter or Destroy Documents But Continued To
            Do So.. . . . . . . . . . . . . . . . . . . . . . . . 21

      O.    FARAHI Replaced O'Callaghan with Sylvia Scott.. . . 22

i

**TABLE OF CONTENTS (CONTINUED)**

PAGE(S)

P.   Defendant Made Additional Alterations to The PPMs
     and Created the 2006 Supplement to the 2003 PPM on
     June 3, 2009. . . . . . . . . . . . . . . . . . . .   22

Q.   Defendant Lied to Ms. Scott About The Dates the
     PPMs were Revised.. . . . . . . . . . . . . . . . .   23

R.   Defendant Provided Ms. Scott with the Altered PPMs
     That She Ultimately Produced to the SEC.. . . . . .   24

S.   After the SEC Subpoenaed the Native Files and
     Metadata for the PPMs and Notes, Defendant Had the
     Metadata Scrubbed.. . . . . . . . . . . . . . . . .   25

T.   FARAHI Testified to the False PPM Story Before the
     SEC on Three Days.. . . . . . . . . . . . . . . . .   26

U.   Defendant Admitted to Nixon Peabody's Outside
     Counsel That He Altered the PPMs During the SEC
     Investigation.. . . . . . . . . . . . . . . . . . .   27

V.   Defendant Lied in His Proffer With the Government
     on May 24, 2011.. . . . . . . . . . . . . . . . . .   28

III. GOVERNMENT WITNESSES.. . . . . . . . . . . . . . . .   29

IV.  PERTINENT LAW. . . . . . . . . . . . . . . . . . . .   30

A.   18 U.S.C. §§ 371, 1512(k): Conspiracy.. . . . . . .   30

     1.   Essential Elements.. . . . . . . . . . . . . .   30

     2.   Agreement. . . . . . . . . . . . . . . . . . .   31

     3.   Overt Acts.. . . . . . . . . . . . . . . . . .   31

     4.   Knowledge of and Participation in the
          Conspiracy.. . . . . . . . . . . . . . . . . .   32

     5.   Proof of Conspiracy. . . . . . . . . . . . . .   33

B.   18 U.S.C. § 1512(c)(2): Obstruction of Justice. . .   34

C.   18 U.S.C. § 1519: Destruction, Alteration or
     Falsification of Records. . . . . . . . . . . . . .   34

D.   Accessory After the Fact. . . . . . . . . . . . . .   35

ii

**TABLE OF CONTENTS (CONTINUED)**

PAGE(S)

E.   18 U.S.C. § 2: Liability As A Principal... . . . . .   37

    1.   Aiding and Abetting. . . . . . . . . . . . .   38

    2.   Causing an Act to Be Done. . . . . . . . . .   38

V.   EVIDENTIARY ISSUES... . . . . . . . . . . . . . . . .   40

A.   Victim Testimony. . . . . . . . . . . . . . . .   40

B.   Testimony of What Listener Understood Declarant
     to Mean.. . . . . . . . . . . . . . . . . . . .   40

C.   Defendant's Prior Statements. . . . . . . . . .   41

D.   Adoptive Admissions.. . . . . . . . . . . . . .   41

E.   Co-Conspirator and Co-Schemer Statements. . . .   42

F.   Business Records. . . . . . . . . . . . . . . .   44

G.   Duplicates. . . . . . . . . . . . . . . . . . .   46

H.   Chain of Custody. . . . . . . . . . . . . . . .   47

I.   Authentication and Identification.. . . . . . .   47

J.   Past Recollection Recorded. . . . . . . . . . .   49

K.   Routine Practice. . . . . . . . . . . . . . . .   49

L.   Charts and Summaries. . . . . . . . . . . . . .   49

M.   Cross-Examination.. . . . . . . . . . . . . . .   52

V.   CONCLUSION... . . . . . . . . . . . . . . . . . . . .   55

## TABLE OF AUTHORITIES

**FEDERAL CASES:**                                                             **PAGE(S)**

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005)................................... 34

*Barsky v. United States,*
    339 F.2d 180 (9th Cir. 1964)........................ 50

*Bourjaily v. United States,*
    483 U.S. 171 (1987)............................. 42, 43

*Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.,*
    466 F.2d 722 (7th Cir. 1972)........................ 51

*Gallego v. United States,*
    276 F.2d 914 (9th Cir. 1960)............... 47, 48, 49

*Harvey v. Myers,*
    28 F.3d 106, 1994 WL 327562 (9th. Cir. 1994)......... 44

*Kennedy v. Los Angeles Police Department,*
    901 F.2d 702 (9th Cir. 1990)........................ 45

*La Porte v. United States,*
    300 F.2d 878 (9th Cir. 1962)........................ 46

*Michelson v. United States,*
    335 U.S. 469 (1948)................................. 54

*Phillips v. United States,*
    356 F.2d 297 (9th Cir. Cir. 1965)................... 40

*Pinkerton v. United States,*
    328 U.S. 640 (1949)................................. 33

*S.E.C. v. Platinum Wireless International Corp.,*
    617 F.3d 1072 (9th Cir. 2010)........................ 8

*Shale v. United States,*
    388 F.2d 616 (5th Cir. 1968)........................ 40

*United States v. Abushi,*
    682 F.2d 1289 (9th Cir. 1982)............... 31, 32, 33

iv

1                    **TABLE OF AUTHORITIES (CONTINUED)**

2    **FEDERAL CASES:**                                                **PAGE(S)**

3    *United States v. Alvarez-Valenzuela,*
         231 F.3d 1198 (9th Cir. 2000).......................... 33
4
     *United States v. Andreen,*
5        628 F.2d 1236 (9th Cir. 1980)......................... 32

6    *United States v. Arbelaez,*
         719 F.2d 1453 (9th Cir. 1983).................... 33, 43
7
     *United States v. Bailleux,*
8        685 F.2d 1105 (9th Cir. 1982)......................... 53

9    *United States v. Baker,*
         855 F.2d 1353 (8th Cir. 1988)......................... 46
10
     *United States v. Barnett,*
11       667 F.2d 835 (9th Cir. 1982).......................... 38

12   *United States v. Basey,*
         613 F.2d 198 (9th Cir. 1979).................... 33, 45
13
     *United States v. Becker,*
14       720 F.2d 1033 (9th Cir. 1983)................... 30, 31

15   *United States v. Black,*
         767 F.2d 1334 (9th Cir. 1985)................... 48, 52
16
     *United States v. Blackwood,*
17       878 F.2d 1200 (9th Cir. 1989)......................... 48

18   *United States v. Boise,*
         916 F.2d 497 (9th Cir. 1990).......................... 54
19
     *United States v. Brooks,*
20       473 F.2d 817 (9th Cir. 1973).......................... 41

21   *United States v. Burreson,*
         643 F.2d 1344 (9th Cir. 1981)......................... 41
22
     *United States v. Bush,*
23       522 F.2d 641 (7th Cir. 1975).......................... 40

24   *United States v. Carruth,*
         699 F.2d 1017 (9th Cir. 1983)......................... 33
25
     *United States v. Castro,*
26       887 F.2d 988 (9th Cir. 1989).......................... 31

27

28                                    v

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

**FEDERAL CASES:**                                                    **PAGE(S)**

3
*United States v. Catena,*
    500 F.2d 1319 (3d Cir. 1974)........................... 39
4

*United States v. Causey,*
5    835 F.2d 1289 (9th Cir. 1987)......................... 39

6
*United States v. Childs,*
    5 F.3d 1328 (9th Cir. 1993)........................... 45
7

*United States v. Chu Kong Yin,*
8    935 F.2d 990 (9th Cir. 1991).......................... 48

9
*United States v. Crespo de Llano,*
    838 F.2d 1006 (9th Cir. 1987)......................... 33
10

*United States v. De Peri,*
11    778 F.2d 963 (3d Cir. 1985)........................... 50

12
*United States v. Emuegbunam,*
    268 F.3d 377 (6th Cir. 2001).......................... 44
13

*United States v. Everett,*
14    692 F.2d 596 (9th Cir. 1982).......................... 30

15
*United States v. Federico,*
    658 F.2d 1337 (9th Cir. 1981)......................... 32
16

*United Stats v. Feldman,*
17    825 F.2d 124 (7th Cir. 1987).......................... 40

18
*United States v. Fleishman,*
    684 F.2d 1329 (9th Cir. 1982).................... 30, 32
19

*United States v. Fontenot,*
20    611 F.3d 734 (11th Cir. 2010)......................... 35

21
*United States v. Friedman,*
    593 F.2d 109 (9th Cir. 1979).......................... 32
22

*United States v. Gardner,*
23    611 F.2d 770 (9th Cir. 1980).......................... 51

24
*United States v. Gaskins,*
    849 F.2d 454 (9th Cir. 1988).......................... 38
25

*United States v. Gay,*
26    967 F.2d 322 (9th Cir. 1992).......................... 53

27

28                                    vi

TABLE OF AUTHORITIES (CONTINUED)

**FEDERAL CASES:**                                              PAGE(S)

*United States v. Gibson,*
    690 F.2d 697 (9th cir. 1982)........................... 40

*United States v. Gleason,*
    616 F.2d 2 (2d Cir. 1979)............................. 39

*United States v. Gordon,*
    844 F.2d 1397 (9th Cir. 1988)........................ 42

*United States v. Graves,*
    143 F.3d 1185 (9th Cir. 1998)........................ 35

*United States v. Gray,*
    642 F.3d 371 (2d Cir. 2011).......................... 35

*United States v. Hadley,*
    918 F.2d 848 (9th Cir. 1990)......................... 54

*United States v. Harrington,*
    923 F.2d 1371 (9th Cir. 1991).................... 48, 49

*United States v. Hearst,*
    563 F.2d 1331 (9th Cir. 1977)........................ 52

*United States v. Hill,*
    279 F.3d 731 (9th Cir. 2002)......................... 35

*United States v. Huber,*
    772 F.2d 585 (9th Cir. 1985)......................... 45

*United States v. Inciso,*
    292 F.2d 374 (7th Cir. 1961)......................... 39

*United States v. Isaacs,*
    493 F.2d 1124 (7th Cir. 1974)........................ 40

*United States v. Johnson,*
    594 F.2d 1253 (9th Cir. 1979)........................ 50

*United States v. Kaiser,*
    660 F.2d 724 (9th Cir. 1981)......................... 47

*United States v. Kearney,*
    560 F.2d 1358 (9th Cir. 1977)........................ 31

*United States v. Kenofskey,*
    243 U.S. 440 (1917).................................. 39

vii

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL CASES:**                                                    PAGE(S)

*United States v. Kiriki,*
    756 F.2d 1449 (9th Cir. 1985).......................... 33

*United States v. Knigge,*
    832 F.2d 1100 (9th Cir. 1987).......................... 43

*United States v. Krasn,*
    614 F.2d 1229 (9th Cir. 1980).......................... 31

*United States v. Layton,*
    720 F.2d 548 (9th Cir. 1983).......................... 44

*United States v. Leal,*
    509 F.2d 122 (9th cir. 1975).......................... 47

*United States v. Lemire,*
    720 F.2d 1327 (D.C. Cir. 1983).......................... 51

*United States v. Lyman,*
    592 F.2d 496 (9th Cir. 1978).......................... 32

*United States v. Markee,*
    425 F.2d 1043 (9th Cir. 1970).......................... 39

*United States v. McClellan,*
    165 F.3d 535 (7th Cir. 1999).......................... 44

*United States v. McKoy,*
    771 F.2d 1207 (9th Cir. 1985).......................... 38

*United States v. Mehrmanesh,*
    682 F.2d 1303 (9th Cir. 1982).......................... 52

*United States v. Meyers,*
    847 F.2d 1408 (9th Cir. 1988).......................... 50

*United States v. Miranda-Uriarte,*
    649 F.2d 1345 (9th Cir. 1981).......................... 52

*United States v. Montgomery,*
    384 F.3d 1050 (9th Cir. 2004).......................... 30

*United States v. Norton,*
    867 F.2d 1354 (11th Cir. 1989).......................... 46

*United States v. Ospina,*
    739 F.2d 448 (9th Cir. 1984).......................... 41

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

**FEDERAL CASES:**                                                    **PAGE(S)**

3
*United States v. Perry,*
        550 F.2d 524 (9th Cir. 1977)....................... 32, 33

4

*United States v. Peterson,*
5       549 F.2d 654 (9th Cir. 1977)........................... 32

6
*United States v. Portac. Inc.,*
        869 F.2d 1288 (9th Cir. 1989)......................... 42
7

*United States v. Poschwatta,*
8       829 F.2d 1477 (9th Cir. 1987)......................... 51

9
*United States v. Radseck,*
        718 F.2d 233 (7th Cir. 1983).......................... 50
10

*United States v. Ramirez,*
11      710 F.2d 535 (9th Cir. 1983).......................... 32

12
*United States v. Ranney,*
        719 F.2d 1183 (1st Cir. 1983)......................... 40
13

*United States v. Ray,*
14      930 F.2d 1368 (9th Cir. 1990)................. 30, 45, 46

15
*United States v. Romero,*
        282 F.3d 683 (9th Cir. 2002).......................... 31
16

*United States v. Rubino,*
17      431 F.2d 284 (6th Cir. 1970).......................... 50

18
*United States v. Saavedra,*
        684 F.2d 1293 (9th Cir. 1982)......................... 33
19

*United States v. Sangmeister,*
20      685 F.2d 1124 (9th Cir. 1982)......................... 31

21
*United States v. Sartori,*
        443 F.2d 373 (9th Cir. 1971).......................... 39
22

*United States v. Schmit,*
23      881 F.2d 608 (9th Cir. 1989).......................... 42

24
*United States v. Shirley,*
        884 F.2d 1130 (9th Cir. 1989)......................... 51
25

*United States v. Smith,*
26      609 F.2d 1294 (9th Cir. 1979)......................... 32

27

28                                   ix

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL CASES:**                                             PAGE(S)

*United States v. Smith,*
    893 F.2d 1573 (9th Cir. 1990)...................... 42, 47

*United States v. Soulard,*
    730 F.2d 1292 (9th Cir. 1984)......................... 51

*United States v. Spawr Optical Research Inc.,*
    685 F.2d 1076 (9th Cir. 1982)......................... 43

*United States v. Stauffer,*
    922 F.2d 508 (9th Cir. 1990).......................... 32

*United States v. Tarallo,*
    380 F.3d 1174 (9th Cir. 2004)......................... 37

*United States v. Testa,*
    548 F.2d 847 (9th Cir. 1977).......................... 34

*United States v. Thomas,*
    887 F.2d 1341 (9th Cir. 1989)......................... 33

*United States v. Townsend,*
    630 F.3d 1003 (11th Cir. 2011)........................ 34

*United States v. Trotter,*
    529 F.2d 806 (3d Cir. 1976)........................... 34

*United States v. Vaccaro,*
    816 F.2d 443 (9th Cir. 1987).......................... 38

*United States v. Valles-Vallencia,*
    811 F.2d 1232 (9th Cir. 1987)......................... 42

*United States v. Vaughn,*
    797 F.2d 1485 (9th Cir. 1986)......................... 38

*United States v. Willis,*
    759 F.2d 1486 (11th Cir. 1985)........................ 41

*United States v. Wilson,*
    487 F.2d 510 (5th Cir. 1973).......................... 40

*United States v. Winograd,*
    656 F.2d 279 (7th Cir. 1981).......................... 33

*United States v. Woods,*
    335 F.3d 993 (9th Cir. 2003).......................... 36

x

**TABLE OF AUTHORITIES (CONTINUED)**

**FEDERAL STATUTES:**                                                   **PAGE(S)**

15 U.S.C. § 77(d)(2) &............................................ 37

15 U.S.C. §§ 77e, 77x............................................ 36

18 U.S.C. § 1341................................................. 35

18 U.S.C. §§ 1512(c)(2).......................................... 34

18 U.S.C. § 1515(a)(1)(C)........................................ 34

18 U.S.C. § 1519................................................. 34

18 U.S.C. § 2(b)......................................... 37, 38, 39

18 U.S.C. § 3 ................................................... 35

18 U.S.C. §§ 371, 1512(k)........................................ 30

Fed. R. Evid. 104(a)............................................. 45

Fed. R. Evid. 405(a)............................................. 54

Fed. R. Evid. 406................................................ 49

Fed. R. Evid. 608(b)............................................. 53

Fed. R. Evid. 611(a)........................................ 50, 52

Fed. R. Evid. 801(d)(2)(A)............................... 41, 42, 43

Fed. R. Evid. 803(6)..................................... 44, 46, 49

Fed. R. Evid. 901(a)............................................. 48

Fed. R. Evid. 902(11).................................... 45, 46, 49

Fed. R. Evid. 1003............................................... 47

Fed. R. Evid. 1006............................................... 49

xi

# I.

## STATUS OF THE CASE

A.   Trial is scheduled to commence on October 30, 2012, at 9:00 a.m., before the Honorable Philip S. Gutierrez, United States District Judge.  DAVID TAMMAN ("defendant") and the government have waived jury trial.

B.   The government estimates that its case-in-chief will take approximately six days.

C.   Absent stipulations from the defense, the government expects to call approximately 18 witnesses in its case-in-chief.

D.   The services of a translator will not be necessary, except possibly for a few witnesses who may need a Farsi translator.

E.   Defendant has posted a signature bond pending trial.

F.   The First Superseding Indictment ("FSI"), which was returned on April 25, 2012, charges defendant with ten separate criminal violations, including: (1) one count of conspiring with co-defendant JOHN FARAHI ("FARAHI") to obstruct justice; (2) three counts of aiding and abetting co-defendant FARAHI in substantively obstructing justice through FARAHI's false and misleading testimony under oath before the Securities and Exchange Commission ("SEC"); (3) five counts of altering and falsifying records with the intent to obstruct a matter within the jurisdiction of the SEC; and (4) acting as an accessory after the fact to co-defendant FARAHI's mail fraud and securities law offenses.  A copy of the FSI is attached to the Court's copy of this memorandum as Exhibit A.

II.

**SUMMARY OF THE EVIDENCE**

**A.   Overview of Defendant's Obstructive Conduct**

From at least 2005 onwards, co-defendant FARAHI had been operating a fraud scheme through his various companies, including Newpoint Financial Services ("NFS").  FARAHI raised tens of millions of dollars from investors by selling debentures through NFS without telling investors that he was taking their money for his own personal use and applying a portion of these funds to pay back prior investors.  Instead of disclosing these uses of investors funds, FARAHI assured investors that their money would be invested in safe, low-risk investments like corporate bonds or CDs yielding fixed rates of return on investors' principal.

Defendant was FARAHI's long-time securities lawyer who had a prior track record of helping co-defendant FARAHI avoid scrutiny from federal regulators in late 2004 by creating false and fictitious offering documents.  When the Securities and Exchange Commission ("SEC") conducted a surprise inspection of FARAHI's offices on April 13, 2009, co-defendant FARAHI called defendant, who immediately hastened to meet FARAHI at his personal residence in order to assist FARAHI in creating a fictitious, backdated NFS' private placement offering memorandum ("PPMs" or "PPOM").  Starting that day and continuing for the next several months, defendant and co-defendant FARAHI worked together to obstruct the SEC's investigation of NFS by making it appear, both by creating backdated offering documents and giving false testimony, that NFS's investors were informed all along that FARAHI was personally "borrowing" their money and that their money was going

to be used to pay back prior investors.  In fact, these new
disclosures that defendant and FARAHI inserted into NFS'
backdated PPMs in April 2009 and thereafter to mislead the SEC
<u>were</u> <u>never</u> <u>made</u> to NFS investors at or before the time that they
invested, a fact of which defendant was well aware.

In essence, defendant's role in the conspiracy was, starting
on April 13, 2009, to prepare a set of investor disclosure
documents, <u>i.e.</u>, PPMs, that made it appear that NFS had been
telling investors all along that their money would be loaned to
FARAHI for his own personal use and would also be used to pay
back prior investors.  Co-defendant FARAHI's role was to tell the
SEC that he had been giving these disclosure documents to
investors the whole time and accordingly that he had been fully
transparent about the material terms of the NFS investment and
had not misled investors.

Beginning from the day the SEC showed up unannounced at
NFS's offices, defendant began altering and backdating NFS's
PPMs.  On April 13, 2009, defendant took a draft PPM that was
dated March __ 2009, which was a working draft of a PPM for a
future offering, and changed the offering date of the PPM to
October 1, 2008, thereby making it appear that this PPM was a
final version of a PPM actually given to investors for a past
offering commencing on October 1, 2008.  That same day, he also
directed his associate to draft a promissory note showing that
FARAHI had been "borrowing" millions of dollars from NFS.  After
his associate prepared the note with a date of April __, 2009,
defendant backdated it to October 1, 2008, without telling his
associate or anyone else at his law firm, to make it falsely

appear as if co-defendant FARAHI's personal use of NFS' investor funds starting in October 2008 and thereafter was based upon an actually existing promissory note.

After April 13, 2009, the SEC made it clear that it was interested in obtaining copies of the PPMs that NFS provided to investors for further review.  Despite being specifically warned against altering documents by his partner at Nixon Peabody LLP ("Nixon Peabody"), Edward O'Callaghan ("O'Callaghan"), defendant went ahead and made additional changes to NFS's PPMs, including PPMs that were dated as far back as 2003.  Indeed, on May 14, 2009 and June 3, 2009 defendant altered NFS's PPM dated May 1, 2003 to add disclosures that the investors' money would be loaned to FARAHI.  In addition, on June 3, 2009, defendant created a brand new Supplement to the 2003 PPM, which he dated April 30, 2006.  This new Supplement to the 2003 PPM purported to make even more disclosures to investors and purported to extend the expiration date of the expired May 1, 2003 offering all the way to October 1, 2008.

Once defendant added all of these new disclosures to the various PPM documents, he gave them to co-defendant FARAHI's lawyer handling the SEC document production for NFS, Sylvia Scott, to produce to the SEC.  Ms. Scott turned these documents over to the SEC in June and July 2009 as the historical PPMs purportedly used by NFS over the course of its offerings, not knowing that defendant had made myriad alterations to the PPMs starting in April 2009 and continuing through early June 2009.

Co-defendant FARAHI also did his part.  Over the course of three days of testimony, FARAHI lied to the SEC about the PPM

documents defendant had created.  FARAHI falsely testified that the newly created and altered PPMS were actually created years earlier and had been given to investors at the time they invested.

During the time period that defendant was altering and creating the PPMs, defendant took steps affirmatively to conceal what he was doing.  He did not tell his partners, associates, or co-counsel that he had been altering and creating PPMs in connection with their production to the SEC.  To the contrary, he affirmatively lied to them.  Indeed, he falsely told his partner O'Callaghan that the disclosures of loans to FARAHI were made to investors in a previous PPM for an offering commencing in October 2008.  He also lied to his co-counsel handling the SEC production, Ms. Scott, falsely telling her in early June 2009 that the May 1, 2003 PPM he altered on May 14, 2009 and June 3, 2009 was in fact revised in January or February 2005, when defendant knew full well that he had just made these revisions to the 2003 PPMs within the last three weeks.

By July 2009, the SEC was suspicious about the true dates the PPMs had been created.  The SEC subpoenaed the PPM computer files and corresponding metadata from NFS so that it could determine the actual creation dates of those documents.  When Ms. Scott tried to get the PPM computer files from defendant, he initially refused to give them to her.  When she insisted, he directed the IT department at Nixon Peabody to "scrub" the metadata from the files before turning them over to Ms. Scott, a fact he did not disclose to Ms. Scott.

The SEC also subpoenaed defendant's law firm, Nixon Peabody,

for the PPM computer files.  Once Nixon Peabody's outside counsel Russell Ryan, started reviewing the firm's computer records, he discovered that defendant had altered NFS's PPMs before they were produced to the SEC.  When Mr. Ryan confronted defendant with the evidence he found, defendant admitted to altering the documents, but gave an incoherent explanation for why he had done so.  After that initial interview, defendant refused to discuss the alterations he made with Mr. Ryan or other partners at the firm, thereby resulting in his separation from Nixon Peabody.

After being charged in this case, defendant came in for a proffer with the government in May 2011.  During the proffer he admitted to making many of the changes to the PPMs, but denied making several of the changes that took place on June 3, 2009, which was just days before they were produced to the SEC. Defendant also provided a new account of why he made the changes he now conceded he inserted – namely, that he modified the PPMs to include new disclosures as part of a rescission offer to prior investors who had initially not received the proper disclosures. Defendant's new rescission story, however, is unsupported by any contemporaneous evidence (such as draft rescission letters to investors), belied by salient facts and contrary to what he had previously told Mr. Ryan.

/ /

/ /

-6-

**B.  <u>Co-defendant FARAHI's Underlying Investment Fraud</u>**[1]

Through NFS, FARAHI sold unregistered securities, in particular debentures, to investors FARAHI recruited from his local Farsi-language radio program.  The government intends to call five victim investors who will testify that FARAHI told them their money would be invested in safe investment instruments such as corporate bonds backed by the government or other types of CDs.  A summary witness, Janice Chiquet, and NFS' former bookkeeper, Elaheh Amouei[2], will testify that, rather than using the money for the purposes FARAHI described to investors, he actually used the money for a variety of undisclosed purposes, including taking investor money for his own personal uses, paying off prior investors with new investor money, purchasing or selling highly risky options future contracts in his own personal accounts, and making a number of lavish personal expenditures.  These witnesses will also establish that a private or commercial interstate carrier and/or the U.S. mails were used in furtherance of the fraud scheme.

---

[1] Because the government has charged defendant with serving as an accessory after the fact to co-defendant FARAHI's crimes of mail fraud and selling unregistered securities, the government has to prove up these underlying crimes as part of its proof of the accessory after the fact charge.  Since the government does not anticipate that defendant will challenge its proof that co-defendant FARAHI committed these crimes (to which FARAHI has already pled guilty), it has presented defendant with written stipulations regarding the underlying crimes committed by FARAHI. However, to date, defendant has not agreed to enter into these stipulations.  Accordingly, the government will put on an abbreviated proof of FARAHI's fraud scheme and securities violations at trial.

[2] Ms. Amouei pled guilty to conspiracy to obstruct justice and is testifying pursuant to a cooperation plea agreement.  <u>See</u> <u>United States v. Elaheh Amouei</u>, CR 11-288-PSG.

## C.  Co-defendant FARAHI's Securities Violations

Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c), make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed with the SEC, unless the transaction qualifies for an exemption from registration.  S.E.C. v. Platinum Wireless Intl. Corp., 617 F.3d 1072, 1085 (9th Cir. 2010).  Section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), and SEC Regulation D provide an exemption from registration for "private placement" offerings, provided that certain rules are followed.  See, e.g., SEC Rules 501 through 506.

In order to comply with the SEC Rules for exempt private placement offerings, NFS had to, among other things:

1.  Not use general solicitation or advertising to market the securities.

2.  Only sell securities to sophisticated investors – i.e. investors who "have sufficient knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of the prospective investment."

3.  Provide non-accredited investors[3] with disclosure documents that are generally the same as those used in registered offerings.  This is typically accomplished by giving investors

---

[3] For an individual to be an "accredited investor," he must either (1) have an individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase; or (2) have income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year.  See Rule 501.  Non-accredited investors are those that do not meet the net worth and income limits set forth above.

PPMs that disclose all material facts relative to the transaction.

    4.   Provide non-accredited investors with audited financial statements.

    5.   File "Form D" with the SEC.

    Testimony from investors and Ms. Amouei will establish that NFS's unregistered debenture offering did not comply with the SEC Rules for private placement offerings, and that co-defendant FARAHI knew that he was not satisfying the SEC requirements for lawfully selling unregistered securities.  In addition to making general solicitations and selling to unsophisticated investors, NFS did not provide non-accredited investors with PPMs (and certainly not PPMs with full and accurate disclosures) and/or audited financial statements.  Ms. Amouei and the victim investors will also testify that the debentures were sent to investors through the U.S. mail.

**D.    Defendant Altered NFS's PPM In 2004 To Help FARAHI Avoid Scrutiny From the National Association of Security Dealers**

    In 2003, defendant was an associate at the Liner Yankelvitz ("Liner") law firm.  In April 2003, defendant prepared a PPM for NFS for a private placement debenture offering that was to commence on May 1, 2003 and terminate on May 1, 2005.  This PPM stated that FARAHI's broker/dealer, Newpoint Securities, would be involved in the offering and that the funds raised could be invested in securities.  This PPM did not disclose that FARAHI would be loaning millions of dollars of the money raised to himself.  In October 2004, defendant prepared a memorandum to FARAHI instructing him to give the PPM to all NFS investors

1  before they invested.

2      On November 17, 2004, Ann Glowacki from the National
3  Association of Securities Dealers ("NASD"), now called the
4  Financial Industry Regulatory Authority ("FINRA"), conducted a
5  surprise examination of FARAHI's broker/dealer, Newpoint
6  Securities.  Ms. Glowacki will testify that she learned from a
7  third party that FARAHI was conducting a private placement
8  offering and raising funds from investors.  She spoke to FARAHI
9  during the audit to learn about the private offering and what the
10 money was being used for.  FARAHI told her that the offering was
11 handled by NFS and had nothing to do with Newpoint Securities,
12 which was a broker/dealer under NASD's jurisdiction.  FARAHI told
13 Ms. Glowacki that NFS was run by his wife, Gissou, and that the
14 money that was raised was used for mortgage lending, not
15 investments in securities.  Ms. Glowacki will testify that if
16 what FARAHI had told her was true, that would mean NASD had no
17 jurisdiction over the offering, as its jurisdiction was limited
18 to broker/dealers and the purchase and sale of securities through
19 broker/dealers.

20      To confirm what FARAHI had orally told her, Ms. Glowacki
21 asked FARAHI for a copy of the PPM from the offering.  In January
22 2005, FARAHI provided her with a PPM, dated May 1, 2003, that was
23 consistent with the oral statements he made to her about the
24 offering and NFS.  Based upon what FARAHI orally told her and the
25 PPM he provided, NASD concluded it lacked jurisdiction and
26 stopped its investigation of the NFS offering.  Ms. Glowacki will
27 testify that NASD did not suggest making any revisions to the PPM
28 she was provided, contrary to testimony FARAHI subsequently

provided the SEC in 2009.

Liner computer records show that the PPM that FARAHI provided NASD in January 2005 was substantially edited and altered by defendant on November 29, 2004, right in the middle of the NASD examination.  Liner's computer records indicate that on November 29, 2004, defendant made significant and material changes to the PPM he had previously prepared for NFS in April 2003.  The old PPM defendant prepared (before NASD showed up) said that: (1) Newpoint Securities was involved in the offering and would receive money from it; (2) FARAHI was the principal manager of NFS; and (3) proceeds would be invested in securities, among other things.  The version defendant altered in the middle of the NASD audit on November 29, 2004, which was given to NASD in January 2005, has none of those things in it.  Still dated May 1, 2003, the PPM substantially altered by defendant states, consistent with what FARAHI told Ms. Glowacki, that: (1) Newpoint Securities was not involved in the NFS offering and would receive no money from it; (2) Gissou Farahi was the principal manager of NPFS; and (3) no money from the offering would be used for purchasing securities.  The newly altered PPM also did not disclose that FARAHI had been loaning millions of dollars of the proceeds from the offering to himself.

**E.   Defendant Left Liner in 2007 to Work at Nixon Peabody**

In February 2007, defendant left the Liner law firm and became a non-equity partner at Nixon Peabody.  When he moved over to Nixon Peabody, he took NFS as a client with him, along with NFS's paper files.  In the spring and summer of 2007, emails show that Ms. Amouei provided defendant with updates on the private

placement offering, showing that co-defendant FARAHI was
continuing to raise money from NFS investors during the spring
and summer of 2007, even though at that point the previous May 1,
2003 offering had expired and there was no existing PPM (or
offering) pertaining to the raising of investor funds for this
time period.  In or around October 2007, defendant prepared a new
PPM for a debenture offering commencing on October 31, 2007,
which remained open for two years and did not disclose that
FARAHI intended personally to borrow a substantial portion of the
proceeds of the debenture investments.

**F.**    **In the Fall of 2008, FARAHI Lost Over $20 Million and Began
to Raise Money From Investors to Cover His Losses**

In the fall of 2008, FARAHI lost over $20 million trading
options in his wife's personal options trading account.
Desperate for cash, FARAHI began to aggressively raise money from
investors starting in October and November 2008.  During this
time period, FARAHI began to make fraudulent statements to
investors that their funds would be invested in safe, corporate
bonds backed by the United States Government, as this is when the
Troubled Asset Relief Program ("TARP") was put in place.

The evidence will show that in late October 2008, FARAHI
told defendant that he had suffered significant losses and was
going to use new money he was raising from investors to pay off
old investors.  Defendant told his associate at Nixon Peabody,
Matt Grazier, to prepare a Supplement to the October 31, 2007 PPM
that disclosed two things: (1) NFS had suffered significant
losses in the prior 60 days; and (2) NFS might use the proceeds
of the offering to, among other things, pay back prior investors.

1    After Mr. Grazier prepared the PPM supplement, defendant

2  told him in early November 2008 to prepare instead a new PPM for

3  a future debenture offering.  Defendant told Mr. Grazier to use

4  the October 31, 2007 PPM as a starting point, which Mr. Grazier

5  did.  On November 5, 2008, Mr. Grazier prepared the new PPM draft

6  that defendant requested and sent it to defendant.  Mr. Grazier

7  dated the draft "November __, 2008," as he understood this was

8  for a future offering that had not yet commenced.  This PPM was

9  full of blanks and not in final form.  It had draft language in

10  it about repaying prior investors, but no mention that investor

11  money would be loaned to FARAHI.

12    On November 20, 2008, after receiving the draft PPM from Mr.

13  Grazier, defendant backdated it to October 1, 2008, which

14  coincided with the time period in which FARAHI had first started

15  selling this new round of debentures following his large losses

16  in the options futures market.  In January 2009, when Mr. Grazier

17  saw the draft PPM with the October 1, 2008 date on it, Mr.

18  Grazier noted that the date was wrong and should be changed, as

19  it was his understanding that the offering had not yet commenced.

20  Defendant acquiesced in Grazier's changing of  the date and did

21  not tell Mr. Grazier that the reason he backdated the PPM was

22  because FARAHI had already been selling debentures since at least

23  October 2008.

24  **G.  "Loans to John Farahi" Was Added to the Draft PPM For The
    First Time on March 20, 2009**

25

26    In March 2009, Mr. Grazier was still under the impression

27  that the PPM draft he was working on was for a future debenture

28  offering that had not yet commenced, and that FARAHI had not been

-13-

selling debentures for the last several months.  In mid-March,
Mr. Grazier participated in a conference call with FARAHI,
defendant, and Mr. Kelly, a corporate partner in Nixon Peabody's
Boston office, who was brought in to address disclosure issues.
On that call, FARAHI indicated that it was his practice to
transfer money he raised from investors out of NFS to his
personal account and then invest it in his own name.  FARAHI said
he intended to do that with respect to the future offering they
were working on as well.  When asked whether he had any loan
agreements permitting the transfers, FARAHI said he did not.
During this same phone call, Mr. Kelly stated that he needed to
have loan agreements in place to authorize these transfers.

On this phone call, Mr. Kelly also asserted that it was
important that FARAHI's "borrowing" of investors funds be
disclosed in the new PPM they were working on.  Accordingly,
defendant directed Mr. Grazier to add this disclosure to the
draft PPM.  On March 20, 2009, Mr. Grazier added language to the
draft PPM disclosing that millions of dollars from the offering
would be loaned to FARAHI and that there would be a promissory
note reflecting the borrowing.  Mr. Grazier dated that draft of
the PPM "March ____, 2009," consistent with his understanding that
the offering had not yet commenced.  When he finished the draft,
Mr. Grazier emailed it to defendant, who then forwarded it on to
FARAHI and Mr. Kelly.

**H.   The SEC Conducted A Surprise Inspection On April 13, 2009
     Prompting Defendant To Backdate and Alter the PPM and Create
     a Backdated Promissory Note**

Acting on a tip that FARAHI was running a Ponzi scheme, the
SEC showed up unannounced at FARAHI's offices on April 13, 2009.

-14-

According to billing records and emails, while the SEC was in the
offices on April 13, 2009, FARAHI contacted defendant and
defendant went over to meet him at his house.  Once with FARAHI,
defendant forwarded the non-completed version of the draft PPM
dated "March ___,09" to his personal Gmail account.  Defendant
then began making alterations to the PPM, filling in various
blanks and changing the date on the document to October 1, 2008.
When finished with his alterations, defendant emailed the
revised, backdated PPM to FARAHI.

Defendant's revisions to the PPM identify the date of the
offering as October 1, 2008, and do not contain any other date
indicator or explanatory note on the offering document that would
inform the reader that this extant version of the PPM, with all
its applicable disclosures, was first created not on October 1,
2008 (when the offering supposedly commenced), but over six
months later, on April 13, 2009.  Defendant's revisions thereby
create the false and misleading impression that since October 1,
2008 NFS was telling its debenture holders that their money would
be used to: (1) pay back prior indebtedness to previous NFS
investors; and (2) provide unsecured loans to FARAHI to use for
whatever purposes he deemed appropriate, with substantial
attendant risk to investors' prospects of obtaining return of
their principal.  (This PPM will be referred to as the "2008/2009
PPM.")

In the midst of altering the 2008/2009 PPM on April 13,
2009, defendant also sent Mr. Grazier an email directing him to
prepare "an unsecured revolving promissory note whereby John
Farahi is borrowing money from Newpoint Financial Services, Inc."

Defendant did not tell Mr. Grazier that the SEC was at NFS's offices or give any explanation as to the purpose of the note. Mr. Grazier assumed it was for a future loan.  When Mr. Grazier did not immediately get the note to defendant, defendant sent him another email asking him when the note would be complete.  Mr. Grazier, getting the message that this was urgent, replied he would do it within a half hour and asked defendant for the terms of the note, which defendant provided.

At 2:36 p.m., Mr. Grazier emailed defendant a copy of a draft revolving promissory note in which FARAHI was borrowing money from NFS with all the terms defendant specified.  Mr. Grazier dated the note "April __, 2009," consistent with his belief that this was for a future loan.  After receiving the note, defendant backdated it from "April __, 2009," to "October 1, 2008" and sent it to FARAHI at 7:02 p.m.  Defendant did not tell Mr. Grazier (or anyone else) that he backdated the note.

**I.   <u>Defendant Lied to His Partner About The PPMs</u>**

The SEC did not go away after April 13, 2009.  To the contrary, the SEC started asking for more and more documents, including NFS's PPMs and loan agreements with FARAHI.  FARAHI decided he needed a white collar lawyer with SEC experience to assist him.  Defendant suggested FARAHI use his partner, Mr. O'Callaghan, who was a former Assistant United States Attorney from the Southern District of New York and practiced out of the New York office of Nixon Peabody.

Mr. O'Callaghan will testify that he met with defendant who gave him some background about FARAHI and NFS.  Defendant told Mr. O'Callaghan that NFS had at least two prior debenture

-16-

offerings, one in 2008 and another one at an earlier time.
Defendant further informed Mr. O'Callaghan that he was working on
a PPM for a future offering in 2009 that had not yet been
finalized.  Mr. O'Callaghan asked defendant for a copy of the
October 2008 PPM, which defendant did not provide him.  On his
own, Mr. O'Callaghan found the draft PPM dated "March __, 2009"
on Nixon Peabody's computer system and began reviewing it.  When
he again asked defendant for a copy of the PPM used in the 2008
offering, defendant lied and informed him that the disclosures
contained in the March 2009 draft PPM were the same as those
provided to investors as part of the October 2008 PPM.  Defendant
did not tell O'Callaghan that he altered and backdated the "March
__, 09" PPM to October 1, 2008 just a few days earlier.

**J.   FARAHI Disclosed to Defendant He Had Been Violating the Securities Laws and Defrauding Investors**

By no later than April 30, 2009, defendant was well aware
that FARAHI had been violating the securities laws and defrauding
investors.  On April 30, 2009, O'Callaghan flew out to meet
FARAHI at his Beverly Hills office.  FARAHI, O'Callaghan,
defendant, Mr. Grazier, and two of FARAHI's sons attended this
meeting.  Mr. Grazier will testify that at this meeting FARAHI
admitted that: (1) he did not give PPMs to all investors; and
(2) he took investors' money and could not pay it all back, at
least not at that time.  Mr. Grazier will also testify that
FARAHI said something to the effect that he and defendant were in
this "together."  Further, defendant already knew by at least
March 2009 (if not earlier) that FARAHI had never previously
disclosed to NFS investors that FARAHI had been "borrowing" their

-17-

money and using it for his own personal purposes, as part of his regular operation of NFS, instead of investing it in the manner disclosed in the previous PPMs.

After the April 30, 2009 meeting, Mr. O'Callaghan told defendant it was a good thing the disclosures concerning the loans to FARAHI, and the attendant risks to investors of not getting paid back, were in the PPM. Mr. O'Callaghan said that if these disclosures were not in the PPM, FARAHI would probably be going to jail. Mr. O'Callaghan will testify that, while defendant acknowledged his statement, he notably did not inform Mr. O'Callaghan that he had in fact just inserted these key disclosures into the PPM and backdated the March 2009 draft PPM to reflect an October 1, 2008 offering date only a couple of weeks prior to the April 30th meeting. Nor did defendant tell O'Callaghan that he was going to add those key disclosures to the old 2003 PPMs as well.

**K.**   **Defendant and FARAHI Implement Their Obstruction Plan**

Defendant and FARAHI knew that if the SEC kept investigating, they would discover that NFS had engaged in a fraud and committed serious securities violations. In particular, defendant was aware of several significant, and potentially criminal, violations of securities laws committed by NFS, including that:

(1) NFS had been selling debentures without a PPM from at least October 1, 2008 to April 13, 2009;

(2) NFS had also been selling debentures without a PPM from at least May 1, 2006 to October 31, 2007, as the 2003 PPM terminated on April 30, 2006 (or before);

-18-

1    (3) FARAHI had been borrowing millions of dollars from NFS,
2    as part of his routine course of business over the years, without
3    a loan agreement in place and without having disclosed this to
4    investors in any PPM; and

5    (4) Since at least October 2008, FARAHI had been using new
6    investor money to pay back old investor money, again without
7    having disclosed this to investors in any existing PPM.

8    In the face this problematic history of non-disclosure,
9    defendant and FARAHI came up with a plan to hide these violations
10   from the SEC.  They decided to make it appear that NFS had PPMs
11   in place for the entire time period from May 1, 2003 to
12   April 13, 2009, and further to make it appear that the PPMs
13   provided all of the necessary disclosures and were consistent
14   with what actually occurred with the investors' money.
15   Defendant's role was to create PPM documents with favorable
16   disclosure language, and FARAHI's role was to tell the SEC that
17   these PPM documents were in place years earlier.

18   Defendant and FARAHI largely had a blank slate to work with
19   because NFS did not actually give out PPMs to its investors.
20   Accordingly, they knew that the SEC would not likely get PPMs
21   from investors that conflicted with the altered PPMs they were
22   creating in 2009.  There was one PPM out there, however, that
23   could give them trouble – the PPM that NFS had provided to NASD
24   (now FINRA), in January 2005.  Accordingly, defendant and FARAHI
25   had to come up with a story to address the issues presented by
26   the historical PPM in FINRA's files.

27   This is the false story they came up with, and that FARAHI
28   eventually told to the SEC under oath, which is summarized as

-19-

follows:

> *On May 1, 2003, NFS started a new debenture offering with a new PPM dated May 1, 2003, and provided that PPM to all its investors.  That PPM did not disclose that FARAHI was borrowing millions of dollars from NFS.  In January 2005, FINRA conducted an audit of Newpoint Securities and FARAHI voluntarily provided FINRA with a copy of the PPM.  FINRA reviewed the 2003 PPM and blessed it, but suggested that NFS add disclosures to the 2003 PPM to make it clear that FARAHI was borrowing millions of dollars from NFS.  After receiving FINRA's suggestions, in January or February 2005, defendant revised the 2003 PPM to add the loan disclosures and extend the offering to April 30, 2006.  From that point on, NFS gave the revised 2003 PPM to all its investors.*

> *In April 2006, NFS then decided to extend the 2003 offering to October 1, 2008.  To effectuate that, defendant prepared a PPM supplement on April 30, 2006 that extended the offering period and made a few additional disclosures.*

> *On October 1, 2008, NFS commenced a new debenture offering and, on or before October 1, 2008, defendant prepared a new PPM for that offering.  That PPM, which was given to all investors before they invested, disclosed FARAHI was borrowing money from NFS and that new investor money would be used to pay off old investors.*

As the government will prove at trial, this story is wholly false, as defendant well knew.

## L.   Defendant Made Further Alterations to the 2008/2009 PPM On April 30, 2009

During the SEC examination, FARAHI was asked what he had been using the proceeds of the debenture offering for.  FARAHI informed the SEC, among other things, that he planned on purchasing a TV and radio station, and had reserved funds from the offering for that purpose.  As of that date, the 2008/2009 PPM made no mention of a TV and radio station.  To conform the 2008/2009 PPM to what FARAHI had orally told the SEC, computer records show that on April 30, 2009, defendant added those disclosures into the document.

-20-

**M.    On May 14, 2009, Defendant Altered the 2003 PPM to Add Loan and Other Disclosures**

In mid-May, the SEC began asking for additional documents and O'Callaghan also wanted to see the final PPMs given to investors in the 2008 and earlier offerings.  Computer records show that on May 14, 2009, defendant made changes to the May 1, 2003 PPM that was given to NASD in 2005 and saved them as a new document.  Defendant added extensive new language into this PPM that purportedly disclosed that a large portion of the proceeds received from investors would be disbursed as "Loans to John Farahi" and that there was a promissory note reflecting these loans.  On May 18, 2009, defendant emailed this revised 2003 PPM to FARAHI.

**N.    Defendant and FARAHI Were Explicitly Told Not To Alter or Destroy Documents But Continued To Do So**

On May 19, 2009, the SEC sent its latest document requests to O'Callaghan, who then emailed them to defendant and FARAHI.  One of the requests was for "all documents that refer or relate to materials provided to investors and/or prospective investors concerning securities offered and/or sold by FARAHI, NPS, NPFS, and/or any of their employees and/or affiliates."

On May 21, 2009, O'Callaghan sent defendant and FARAHI an email attaching a document retention memorandum and an article about a federal prosecution of obstruction of justice against individuals who made selective disclosures to the SEC and gave false testimony.  In his cover email to defendant and FARAHI, Mr. O'Callaghan wrote **"It is critical to ensure that no documents are altered or discarded."**  (Emphasis added.)  The memo itself goes even further.  It discussed the SEC investigation and document

requests, instructs that all relevant documents be preserved, and ends by stating: "it is important that you **retain and do not discard, alter or destroy** any of these documents or records." (Emphasis added).

**O.   FARAHI Replaced O'Callaghan with Sylvia Scott**

After O'Callaghan sent out his document retention email, FARAHI decided to hire Sylvia Scott from the Freeman, Freeman, Smiley firm to represent Newpoint Securities and NFS before the SEC.  Scott is a former SEC and FINRA lawyer in Los Angeles. FARAHI said he wanted to have someone who had personal relationships with the SEC lawyers involved.  Once Scott was hired, Mr. O'Callaghan essentially dropped out of the representation.  Scott obtained an extension from the SEC to produce the requested PPMs and other documents on June 8, 2009.

**P.   Defendant Made Additional Alterations to The PPMs and Created the 2006 Supplement to the 2003 PPM on June 3, 2009**

O'Callaghan's warnings regarding document retention had no apparent deterrent effect upon defendant.  On June 3, 2009, defendant spent several hours finalizing changes to the various PPMs and creating a new 2006 Supplement to the 2003 PPM. Consistent with his plan with co-defendant FARAHI, defendant created a PPM with an offering date of May 1, 2003, which he titled "03 PPM (pre-FINRA)."  This PPM is largely identical to the PPM that FARAHI provided FINRA in January 2005, with some additional modifications.  Defendant also further edited a second PPM dated May 1, 2003 which he had previously revised on May 14, 2009, which he now titled "03 PPM (post-FINRA)."  Consistent with defendant's plan with co-defendant FARAHI, this PPM was supposed

-22-

to include the revisions purportedly suggested by FINRA after
FINRA reviewed the 2003 PPM in January 2005, including disclosure
that investor proceeds were being used to fund loans to FARAHI.
From whole cloth, defendant also created a PPM Supplement to the
2003 PPM and dated it "April 30, 2006."  This 2006 Supplement
purported to extend the 2003 Offering to October 1, 2008.
Finally, defendant made a few minor edits to the PPM that he had
recently backdated to "October 1, 2008," and he titled that
document "08 PPM.".

On June 3, 2009 at 6:53 p.m., defendant emailed these four
documents - 03 PPM (pre-FINRA), 03 PPM (post-FINRA), 06
Supplement, and 08 PPM - to FARAHI.  Defendant then went over to
FARAHI's house.  At FARAHI's house, further changes to these
documents were made and then the PPMs were emailed to defendant's
Gmail account.  The next day, FARAHI provided these four
documents to Ms. Scott so that she could produce them to the SEC.

**Q.  Defendant Lied to Ms. Scott About The Dates the PPMs were
Revised**

FARAHI gave Ms. Scott the false story, described above,
about defendant revising the 2003 PPM in response to the NASD
audit in late 2004.  The evidence will show that there was never
any feedback from NASD on deficiencies in the 2003 PPM and that
the story about the "revised" 2003 PPM was wholly fabricated.
Ms. Scott will testify that after she received the two versions
of the 2003 PPM from FARAHI -- one without the loan disclosures
and the supposedly revised one including these disclosures -- she
wanted to know the date the second 2003 PPM, with the loan
disclosures, was created.  On June 5, 2009, Ms. Scott sent

defendant an email asking when the 2003 PPM with the loan
disclosures was revised.  Despite having just revised that 2003
PPM two days earlier as well as on May 14, 2009, defendant
falsely told Ms. Scott that "I believe the ppm was revised in
early 2005 - i.e. January or February 2005."  The date provided
by defendant happened to coincide with the approximate date that
NFS actually provided a PPM to NASD in early January 2005, a PPM
that was in fact doctored by defendant in late November 2004.
Accordingly, defendant's response to Ms. Scott corroborated the
false story given to Ms. Scott by FARAHI about the supposed
revision of the 2003 PPM in response to NASD's purported feedback
in early 2005.

**R.    Defendant Provided Ms. Scott with the Altered PPMs That She
        Ultimately Produced to the SEC**

       The PPMs and other documents responsive to the SEC requests
were due to the SEC on June 8, 2009.  That morning, Ms. Scott
realized that the set of PPMs she received from FARAHI had
problems with the page numbering.  Accordingly, Ms. Scott emailed
defendant asking him if he had copies with accurate page numbers,
to which he responded that he did.  Defendant then directed his
assistant to send Ms. Scott the PPMs and PPM Supplement with the
corrected page numbers, which she did.  Ms. Scott then produced
these documents to the SEC that same day, not aware that they had
been repeatedly altered over the preceding two months by
defendant and FARAHI through the insertion of numerous
disclosures that were never previously made.  In addition, these
same documents were produced a second time to the SEC on July 8,
2009 in response to a subpoena.

Shortly thereafter, on or about June 16, 2009, Ms. Scott also provided the SEC the promissory notes dated October 1, 2008 that purported to document FARAHI legally borrowing money from NFS.  The first five paragraphs of these promissory notes are largely identical to the note that defendant had Mr. Grazier prepare and which he then backdated on April 13, 2009.

**S.   After the SEC Subpoenaed the Native Files and Metadata for the PPMs and Notes, Defendant Had the Metadata Scrubbed**

On June 15, 2009, the SEC issued a subpoena to NFS that requested, among other things, the native files and metadata for the PPMs and promissory notes.  Ms. Scott will testify that defendant was extremely uncooperative when she tried to get these native files from defendant, even though defendant and Ms. Scott represented the same client and Ms. Scott was responsible for ensuring NFS' compliance with a duly issued SEC subpoena. Defendant told her that the metadata for the documents was privileged.  Ms. Scott explained that there would be no waiver of privilege by giving them to her to review, as they represented the same client.  Mr. O'Callaghan will testify that during this time period defendant kept contacting him to discuss whether he truly had to produce the native files to Scott.  Defendant kept saying the native files had privileged communications on them. Mr. O'Callaghan told defendant that while it was possible the metadata had privileged information in it, defendant should just send the files to Ms. Scott and that defendant and Ms. Scott should then go through the files one by one and make a determination as to whether they actually contained privileged information.  Mr. O'Callaghan will testify that he repeatedly

-25-

told defendant to simply give the files to Ms. Scott for her
independent review.

On July 16, 2009, defendant tried to comply with Ms. Scott's
demands by providing her with pdf files of the PPMs.  Ms. Scott
told defendant that pdfs would not suffice as the SEC wanted the
native files with metadata.  At that point, defendant directed
Nixon Peabody's IT department to "scrub" the metadata from the
PPM files.  He also directed them to scrub the metadata from the
note Grazier created and defendant backdated on April 13, 2009.
After the IT employee deleted the metadata from the documents,
defendant emailed the electronic files, in Microsoft Word format
without the metadata, to Ms. Scott.  Ms. Scott and Mr.
O'Callaghan will both testify that defendant did not inform them
that he caused the deletion of the metadata from these files.

Eventually, defendant did give Ms. Scott most of the NFS
native files with their metadata after meeting with Nixon
Peabody's general counsel.  However, when defendant gave Ms.
Scott these documents, he told her they were privileged, implying
they should not be produced to the SEC.

**T.   FARAHI Testified to the False PPM Story Before the SEC on**
**Three Days**

FARAHI testified before the SEC on August 4, 2009, September
2, 2009, and September 3, 2009, pursuant to a subpoena.  Billing
records show that defendant and FARAHI met for over two hours
before and after he testified on August 4, 2009.  During his
testimony, FARAHI told the same false story that he and defendant
came up with and told other lies to keep their conspiracy hidden.
For example, FARAHI falsely testified that:

1.   The 2003 PPM was revised around the end of 2004 or

1    beginning of 2005 in response to FINRA's comments.

2    2.    Every investor in the 2003 debenture offering received
3          a copy of a PPM.

4    3.    The PPM dated October 1, 2008 that was produced to the
5          SEC was completed on or before October 1, 2008.

6    4.    All of the investors in the 2008 debenture offering
7          were provided a copy of the PPM dated October 1, 2008.

8    5.    The $8 million promissory note dated October 1, 2008
9          that was produced to the SEC was drafted around October
10         1, 2008.

11   6.    FARAHI did not think he ever corresponded with
12         defendant via email.

13   7.    FARAHI did not remember if defendant ever sent him an
14         email with a draft PPM.

15   **U.**   **Defendant Admitted to Nixon Peabody's Outside Counsel That**
         **He Altered the PPMs During the SEC Investigation**
16

17        On October 6, 2009, the SEC subpoenaed Nixon Peabody for the
18   native files and metadata relating to the PPMs defendant caused
19   to be produced to the SEC.  Once Nixon Peabody's outside counsel,
20   Russell Ryan, started reviewing the firm's computer records, he
21   discovered that defendant had altered NFS's PPMs before they were
22   produced to the SEC.  When Mr. Ryan confronted defendant with the
23   evidence he found, defendant admitted to altering the documents.
24   Defendant said that the reason he backdated the PPM to October 1,
25   2008 was to coincide with the date FARAHI had started raising
26   money.  He further said that he got the 2003 and 2008 PPMs from
27   FARAHI and that FARAHI told him they were the final copies.  Mr.
28   Ryan thought these explanations made little sense and suggested
     defendant get his own counsel, which he did.  When Mr. Ryan tried

-27-

to interview defendant a second time, defendant declined to participate.

## V. Defendant Lied in His Proffer With the Government on May 24, 2011

At defendant's request, defendant met with the government to provide an innocent explanation for what he had done. During the proffer, defendant admitted to making many, but not all, of the changes to the PPMs during the pendency of the SEC investigation. In one instance, apparently unaware that the government had Nixon Peabody's computer records, defendant specifically, and falsely, denied making a number of changes to the PPMs on June 3, 2009, other than for one date change on one of the documents.

Defendant also admitted that when he came over to FARAHI's house on April 13, 2009 to make changes to the PPMs, he knew the SEC had started its inspection that day. He admitted he made the changes to the 2008/09 PPM that day. Nonetheless, he now asserted, for the first time, that he did not make these changes in order to deceive the SEC or obstruct its investigation, but rather in order to inform prior investors in the 2008 offering of previously undisclosed facts about the nature of their investment with NFS. Defendant insisted that it was appropriate to use the date of October 1, 2008 as the operative date of the revised PPM (rather than April 13, 2009), because that was the true date the offering actually commenced. Defendant further explained that he told FARAHI to give the revised PPMs to NFS's prior investors and offer these investors the right of rescission. Defendant also said the reason he made the changes to the 2003 PPMs in May 2009 was to address the possibility that some of the 2003 investors might want to reinvest or rollover their investments with NFS, in

which event they were also entitled to exercise a right of
rescission.   In connection with these possible rollover
investments, defendant acknowledged that NFS was told by Mr.
O'Callaghan to stop taking on any new investments on April 30,
2009.

When asked why he lied to Ms. Scott about the revision date
of the 2003 PPM, defendant did not provide a credible answer,
other than observing that the date he specified (January or
February 2005) corresponded to the approximate date that the 2003
offering concluded.

### III.

### GOVERNMENT WITNESSES

The government is likely to call the following witnesses in
approximately the following order in its case-in-chief:

| No. | Name | Description |
|-----|------|-------------|
| 1 | Charlene Casey | Liner Firm Custodian |
| 2. | Ann Glowacki | NASD/FINRA Examiner from 2004/2005 |
| 3. | Matthew Grazier | Defendant's Associate at Nixon |
| 4. | Paul Phillips | Nixon Computer Administrator |
| 5. | Edward O'Callaghan | Defendant's Former Partner at Nixon |
| 6. | Sylvia Scott | NFS's SEC Counsel |
| 7. | Shahriar Farhadi | Victim investor |
| 8. | Shahnaz Hedayat | Victim investor |
| 9. | Shahram Hedayati | Victim investor |
| 10. | Mahnaz Farahmand | Victim investor |
| 11. | Elham Paykarra | Victim investor |
| 12. | Elaheh Amouei | NFS Bookkeeper |
| 13. | Jan Chiquet | Summary Witness on NFS's finances |
| 14. | Christine Connolly | SEC Examiner |
| 15. | Brent Smyth | SEC Enforcement Attorney |

| 16. | Kevin Sade | Farahi's Computer Consultant |
| 17. | Russell Ryan | Nixon Outside Counsel |
| 18. | David Lazarus | Agent who participated in proffer |

Further, if there are any foundational objections to the government's exhibits, the government is also prepared to call several witnesses to authenticate the documents, including custodians of records for NFS, Nixon Peabody, and various banks and brokerages.  To date, defendant has said he will stipulate to the foundation for most of the government's exhibits, so the government does not currently believe this will be necessary.

**IV.**

**PERTINENT LAW**

**A.   18 U.S.C. §§ 371, 1512(k): Conspiracy**

    **1.   Essential Elements**

The essential elements of conspiracy are: (1) an agreement between two or more persons to commit at least one crime as charged in the indictment; (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act in furtherance of the conspiracy, with all jurors agreeing on at least one overt act that was committed.  9th Cir. Model Jury Instr. 8.20 (2010); United States v. Montgomery, 384 F.3d 1050, 1062 (9th Cir. 2004); United States v. Ray, 930 F.2d 1368, 1371 (9th Cir. 1990); United States v. Becker, 720 F.2d 1033, 1035 (9th Cir. 1983); United States v. Everett, 692 F.2d 596, 601 (9th Cir. 1982); United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir. 1982).  The government need prove only one of the listed objects of the

1  conspiracy in order to prove the conspiracy.  United States v.
2  Castro, 887 F.2d 988, 993 (9th Cir. 1989).

3      **2.   Agreement**

4      The government need not prove direct contact between co-
5  conspirators or the existence of a formal agreement.  Instead, an
6  agreement constituting a conspiracy may be inferred from the acts
7  of the parties and other circumstantial evidence indicating
8  concert of action for accomplishment of a common purpose.  9th
9  Cir. Model Jury Instr. 8.20; United States v. Romero, 282 F.3d
10  683, 687 (9th Cir. 2002); Becker, 720 F.2d at 1035; United States
11  v. Abushi, 682 F.2d 1289, 1293 (9th Cir. 1982).  The standard for
12  determining the existence of a single conspiracy is whether there
13  was one overall agreement among the parties to carry out the
14  objectives of the conspiracy. United States v. Kearney, 560 F.2d
15  1358, 1362 (9th Cir. 1977).

16      A single overall agreement need not be revealed by
17  continuous activity.  A suspension of activities does not divide
18  a single conspiracy into more than one conspiracy.  United
19  States v. Krasn, 614 F.2d 1229, 1236 (9th Cir. 1980).
20  Furthermore, a conspiracy is presumed to continue until there is
21  affirmative evidence of abandonment of or withdrawal from the
22  purposes of the conspiracy.  Krasn, 614 F.2d at 1236.

23      There must be at least two persons involved in the
24  conspiracy.  Becker, 720 F.2d at 1035; United States v.
25  Sangmeister, 685 F.2d 1124, 1126 (9th Cir. 1982).

26      **3.   Overt Acts**

27      The government need only prove one of the overt acts charged
28  in the conspiracy count of the indictment.  9th Cir. Model Jury

-31-

Instr. 8.20; <u>United States v. Lyman</u>, 592 F.2d 496, 500 (9th Cir. 1978).  An overt act need not itself be criminal; its only function is to demonstrate that the conspiracy is operative. <u>United States v. Andreen</u>, 628 F.2d 1236, 1248 (9th Cir. 1980).

    **4.**   **<u>Knowledge of and Participation in the Conspiracy</u>**

The government has the burden of proving beyond a reasonable doubt that a conspiracy did exist and that each defendant was a member of the conspiracy charged.  <u>United States v. Friedman</u>, 593 F.2d 109, 115 (9th Cir. 1979); <u>United States v. Peterson</u>, 549 F.2d 654, 657 (9th Cir. 1977).  The government must show that the defendant knew of his connection to the charged conspiracy. <u>United States v. Federico</u>, 658 F.2d 1337, 1344 (9th Cir. 1981), <u>overruled on other grounds</u>, <u>United States v. De Bright</u>, 730 F.2d 1255, 1259 (9th Cir. 1984) (<u>en</u> <u>banc</u>); <u>United States v. Smith</u>, 609 F.2d 1294, 1299 (9th Cir. 1979).

Once the existence of a conspiracy is shown, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy – even if the connection is slight – is sufficient to convict him or her of knowing participation in the conspiracy.  <u>United States v. Stauffer</u>, 922 F.2d 508, 514-15 (9th Cir. 1990); <u>United States v. Ramirez</u>, 710 F.2d 535, 548 (9th Cir. 1983); <u>Fleishman</u>, 684 F.2d at 1340-41; <u>Abushi</u>, 682 F.2d at 1293.

The government need not prove that each co-conspirator knew the identities or roles of all other participants.  <u>Abushi</u>, 682 F.2d at 1293; <u>United States v. Perry</u>, 550 F.2d 524, 528-29 (9th Cir. 1977).  The government must show that each defendant knew, or had reason to know, the scope of the criminal enterprise and that each defendant knew, or had reason to know, that the

benefits to be derived from the operation were probably dependent upon the success of the entire venture.  Id.

A defendant is liable for the substantive acts of his co-conspirators whether or not he directly participates in such acts, so long as those acts fell within the scope of the unlawful agreement, are committed pursuant to and in furtherance of the conspiracy and could be foreseen as natural consequences of the conspiracy.  Ninth Cir. Model Jury Instr. 8.25; Pinkerton v. United States, 328 U.S. 640 (1949); United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1202 (9th Cir. 2000); United States v. Thomas, 887 F.2d 1341, 1345 (9th Cir. 1989); United States v. Crespo de Llano, 838 F.2d 1006, 1019 (9th Cir. 1987); United States v. Arbelaez, 719 F.2d 1453, 1459 (9th Cir. 1983); United States v. Saavedra, 684 F.2d 1293, 1300-01 (9th Cir. 1982); United States v. Basey, 613 F.2d 198, 202 (9th Cir. 1979). Moreover, a defendant can be guilty of conspiracy even if he does not realize benefits directly from the underlying substantive offense, but instead conspires to help others directly and only indirectly helps himself.  United States v. Carruth, 699 F.2d 1017, 1021 (9th Cir. 1983); United States v. Winograd, 656 F.2d 279 (7th Cir. 1981).

**5.   Proof of Conspiracy**

The elements of a conspiracy can be proved by circumstantial evidence that the defendants acted together in furtherance of a common goal.  Thomas, 887 F.2d at 1347; United States v. Kiriki, 756 F.2d 1449, 1453 (9th Cir. 1985); Abushi, 682 F.2d at 1293. Acts of co-conspirators occurring after the charged conspiracy has ended may be introduced to "elucidate the nature of the prior

-33-

1   conspiracy." <u>United States v. Testa</u>, 548 F.2d 847, 852 (9th Cir.

2   1977) (quoting <u>United States v. Trotter</u>, 529 F.2d 806, 812 (3d

3   Cir. 1976)).

4   **B.    18 U.S.C. § 1512(c)(2): Obstruction of Justice**

5        The essential elements of a violation of 18 U.S.C.

6   § 1512(c)(2) are as follows: (1) there was an official

7   proceeding, in this instance, the SEC's Examination of Newpoint

8   Securities and the SEC's Formal Investigation; (2) defendant

9   engaged in conduct that constituted a substantial step toward the

10  commission of the crime of obstruction of an official proceeding;

11  (3) defendant acted corruptly; and (4) the natural and probable

12  effect of the defendant's conduct would be the interference with

13  the due administration of justice. <u>United States v. Townsend</u>,

14  630 F.3d 1003 (11th Cir. 2011).

15       An official proceeding includes a proceeding before a

16  federal government agency, such as the SEC, which is authorized

17  by law.  18 U.S.C. § 1515(a)(1)(C).  "[A]n official proceeding

18  need not be pending or about to be instituted at the time of the

19  offense."  18 U.S.C. § 1512(f)(1).

20       The term "corruptly" must reflect some consciousness of

21  wrongdoing.  <u>Arthur Andersen LLP v. United States</u>, 544 U.S. 696,

22  705-07 (2005).  In addition, there likely must be a nexus between

23  the obstructive conduct and the particular proceeding.   <u>Id.</u>

24  **C.    18 U.S.C. § 1519: Destruction, Alteration or Falsification**
    **of Records**

25

26       The essential elements of a violation of 18 U.S.C. § 1519

27  are as follows: (1) Defendant knowingly altered, destroyed,

28  mutilated, concealed, covered up, falsified or made a false entry

                                -34-

in, (2) any record, document or tangible object, (3) with the
intent to impede, obstruct or influence, (4) a matter within the
jurisdiction of any department or agency of the United States, or
in relation to or contemplation of such a matter.

Unlike Section 1512, under Section 1519, the intent to
obstruct does not have to be directed to a specific matter or a
specific agency. <u>United States v. Gray</u>, 642 F.3d 371, 376-77 (2d
Cir. 2011); <u>United States v. Fontenot</u>, 611 F.3d 734, 739 (11th
Cir. 2010).  Moreover, knowledge of a pending federal
investigation or proceeding is not an element of the offense.
<u>Gray</u>, 642 F.3d at 376-77.  In addition, Section 1519 does not
required the existence or likelihood of a federal investigation.
<u>Id.</u>

**D.   <u>Accessory After the Fact</u>**

The essential elements of a violation of 18 U.S.C. § 3 are
as follows: (1) the underlying crime of mail fraud and selling
unregistered securities as charged in the First Superseding
Indictment ("FSI") was committed by co-defendant FARAHI;
(2) defendant knew that co-defendant FARAHI committed the crimes
of mail fraud and selling unregistered securities as charged in
the FSI; (3) defendant assisted co-defendant FARAHI with the
specific purpose or design to hinder or prevent co-defendant
FARAHI's apprehension, trial or punishment.  Ninth Cir. Model
Jury Instr. 5.2; <u>United States v. Graves</u>, 143 F.3d 1185, 1189
(9th Cir. 1998); <u>United States v. Hill</u>, 279 F.3d 731 (9th Cir.
2002).

To establish that defendant FARAHI committed the crime of
mail fraud, in violation of 18 U.S.C. § 1341, the government must

-35-

establish the following elements: (1) defendant knowingly

participated in a scheme to defraud; (2) the statements made or

facts omitted by defendant in furtherance of the scheme were

material, that is, they had a natural tendency to influence a

person to part with money or property; (3) defendant acted with

intent to defraud; and (4) defendant used or caused to be used

the mails to carry out or attempt to carry out an essential part

of the scheme.  A mailing is caused when one knows the mails will

be used in the ordinary course of business or when one can

reasonably foresee such use.  Ninth Cir. Model Jury Instr. 8.121;

United States v. Woods, 335 F.3d 993 (9th Cir. 2003).

       To establish that defendant FARAHI committed the crime of

willfully selling unregistered securities, in violation of 15

U.S.C. §§ 77e, 77x, the government must establish the following

elements: (1) that the securities which defendant sold, i.e.,

debentures, were not registered with the SEC; (2) the securities

sold were required to be registered with the SEC, because in

selling the securities defendant did not satisfy the requirements

necessary to make the sale of these securities exempt from

registration under applicable SEC regulations; (3) knowing the

securities were not registered and not exempt from the

registration requirement, defendant willfully sold or caused

these securities to be sold to the public; and (4) defendant used

or caused to be used the mails or the means and instrumentalities

of interstate commerce to sell the securities.  Bender & Co.,

Modern Federal Jury Instructions- Criminal § 57-3, Elements of

the Offense.

       With respect to element (2) above, namely, establishing that

the securities sold by defendant FARAHI were not exempt from the registration requirement, under the circumstances of this case defendant FARAHI could only potentially qualify for an exemption from registration under Rule 506 of Regulation D of the Securities Act of 1934.  15 U.S.C. § 77(d)(2) & SEC Regulation D. To qualify for the exemption from registration under that Rule, FARAHI had to, among other things, (1) Not use general solicitation or advertising to market the securities; (2) only sell securities to sophisticated investors, *i.e.,* investors who have sufficient knowledge and experience in financial matters to enable them to evaluate the merits and risks of the prospective investment; (3) if selling to non-accredited investors, FARAHI had to provide disclosure documents generally equivalent to those used in registered offerings, which is typically done by providing PPMs that disclose all material facts; (4) provide non-accredited investors with audited financial statements; and (5) filing a "Form D" with the SEC.  Id.

A person acts "willfully" under the federal securities laws by intentionally undertaking an act that one knows to be wrongful.  "Willfully" does not require that the person know specifically that the conduct was unlawful.  United States v. Tarallo, 380 F.3d 1174, 1188 (9th Cir. 2004); Ninth Cir. Model Jury Instr. 5.5.

**E.   18 U.S.C. § 2: Liability As A Principal**

Under 18 U.S.C. § 2, a person is punishable as a principal if that person aids and abets another person in the commission of

-37-

an offense, or causes another person to commit an offense. Defendant is charged with aiding and abetting co-defendant FARAHI and with causing various acts to be done.

### 1.   <u>Aiding and Abetting</u>

A theory of aiding and abetting is implicit is every substantive count of an indictment.  <u>See</u> <u>United States v. Gaskins</u>, 849 F.2d 454, 459 (9th Cir. 1988).

An aider and abettor is one who, with criminal intent, commands, counsels, or otherwise encourages another to commit a crime, and is liable under 18 U.S.C. § 2(a) for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded. <u>See</u> <u>United States v. Barnett</u>, 667 F.2d 835, 841 (9th Cir. 1982).

To establish guilt as an aider and abettor, the government must prove that (1) the defendant knowingly associated with a criminal venture, and (2) by his participation in that venture sought to make it succeed.  <u>See</u> <u>United States v. Vaccaro</u>, 816 F.2d 443, 455 (9th Cir. 1987); <u>United States v. Vaughn</u>, 797 F.2d 1485, 1492 (9th Cir. 1986).

Conscious assistance in the planning of a crime is a sufficient basis for aider and abettor liability.  <u>See</u> <u>United States v. McKoy</u>, 771 F.2d 1207, 1216 (9th Cir. 1985); <u>Barnett</u>, 667 F.2d at 841-42.

### 2.   <u>Causing an Act to Be Done</u>

Under 18 U.S.C. § 2(b), a person who, with the requisite intent, "causes" another to commit a criminal act is liable for

that act as if he had committed it personally.  See United States v. Gleason, 616 F.2d 2, 20 (2d Cir. 1979), cert. denied, 444 U.S. 1082 (1980).

As used in § 2(b), the word "cause" has a broad application; it means not only to act through an intermediary, but also more generally to procure or bring about the commission of a crime. See United States v. Kenofskey, 243 U.S. 440, 443 (1917); United States v. Markee, 425 F.2d 1043, 1046 (9th Cir. 1970), cert. denied, 400 U.S. 847 (1970); United States v. Inciso, 292 F.2d 374, 378 (7th Cir. 1961).  As the legislative history of a § 2 makes clear, § 2(b) was added to the statute to "remove[ ] all doubt that one who puts in motion or assists in the illegal enterprise . . . is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense."  1948 Revisor's Note.  See also United States v. Causey, 835 F.2d 1289, 1292 (9th Cir. 1987).

Proof that the defendant was the planner, instigator and an intended beneficiary of the scheme is sufficient to establish his liability under § 2(b).  See United States v. Sartori, 443 F.2d 373 (9th Cir. 1971).

A person who causes another to commit a criminal act is guilty as a principal under § 2(b), regardless of the culpability of the party actually committing the act.  See Causey, 835 F.2d at 1292; United States v. Catena, 500 F.2d 1319, 1323 (3d Cir. 1974).

-39-

**V.**

**EVIDENTIARY ISSUES**

**A.   Victim Testimony**

1.   The testimony of a victim about statements made to the victim by the defendant's agents or co-schemers is admissible to establish the existence of the conspiracy and the fraudulent nature of the statements.  Such testimony is not hearsay because it is not offered for the truth of the matter asserted, but only to prove the fact of the utterance.  See United States v. Gibson, 690 F.2d 697, 700-701 (9th cir. 1982); United Stats v. Feldman, 825 F.2d 124, 127 (7th Cir. 1987).

2.   A victim's testimony regarding what the victim understood the statements meant and how he or she was deceived by them is admissible to prove the capacity of the statements to mislead.  See Phillips v. United States, 356 F.2d 297, 307-309 (9th Cir. Cir. 1965); United States v. Wilson, 487 F.2d 510, 511 (5th Cir. 1973); Shale v. United States, 388 F.2d 616, 618-619 (5th Cir. 1968).

3.   A victim may answer hypothetical "what if" questions concerning whether the victim would have done if he or she had known of certain facts.  Such testimony tends to prove the existence of the conspiracy and the deceptive nature of the representations.  See United States v. Ranney, 719 F.2d 1183, 1187-1189 (1st Cir. 1983); United States v. Bush, 522 F.2d 641, 649-651 (7th Cir. 1975); United States v. Isaacs, 493 F.2d 1124, 1162 (7th Cir. 1974).

**B.   Testimony of What Listener Understood Declarant to Mean**

1.   A witness may testify to what he or she understood a

declarant to mean with respect to a statement made by the declarant to the witness.  <u>United States v. Brooks</u>, 473 F.2d 817, 818 (9th Cir. 1973)(per curiam).

**C.   <u>Defendant's Prior Statements</u>**

1.   A statement is not hearsay if the statement is offered against a party and is the party's own statement in either an individual or representative capacity.  Fed. R. Evid. 801(d)(2)(A); <u>United States v. Burreson</u>, 643 F.2d 1344, 1349 (9th Cir. 1981).

2.   When the government admits some of a defendant's prior statements, the door is not thereby opened to the defendant to put in all of his/her out-of-court statements, because when offered by the defendant, the statements are hearsay.  Fed. R. Evid. 801(d)(2); <u>Burreson</u>, 643 F.2d at 1349; <u>United States v. Willis</u>, 759 F.2d 1486, 1501 (11th Cir. 1985) (defendant's exculpatory statement inadmissible when offered by defense).

**D.   <u>Adoptive Admissions</u>**

1.   A statement made by a party-opponent and offered against that party is not hearsay if it is a "statement of which the party has manifested an adoption or belief in its truth."  Fed. R. Evid. 801(d)(2)(A).

2.   The Court must find sufficient foundational facts that a jury could reasonably conclude that defendant actually heard, understood and acceded to the statement(s).  <u>United States v. Ospina</u>, 739 F.2d 448, 451 (9th Cir. 1984) (writings in residence of defendant and acted upon defendant are adoptive admissions and

-41-

therefore non-hearsay); <u>United States v. Valles-Vallencia</u>, 811
F.2d 1232, 1237 (9th Cir. 1987) (handwriting on ledgers are
adoptive admissions).

**E.   <u>Co-Conspirator and Co-Schemer Statements</u>**

1.   A statement is not hearsay if it is "a statement by a
co-conspirator of a party during the course and in furtherance of
the conspiracy." Fed. R. Evid. 801(d)(2)(E).

2.   For Rule 801(d)(2)(E) to apply, it is not necessary
that the declarant be charged with the crime of conspiracy; any
"concert of action creates a conspiracy for purposes of the
evidence rule." <u>United States v. Portac. Inc.</u>, 869 F.2d 1288,
1294 (9th Cir. 1989).

3.   For a statement to be admissible under Rule
801(d)(2)(E), the offering party must establish that: (a) the
statement was in furtherance of the conspiracy; (b) it was made
during the life of the conspiracy; and (c) the defendant and
declarant were members of the conspiracy. <u>Bourjaily v. United
States</u>, 483 U.S. 171, 175 (1987); <u>United States v. Smith</u>, 893
F.2d 1573, 1578 (9th Cir. 1990).

4.   The offering party has the burden of proving these
foundational facts by a preponderance of the evidence.
<u>Bourjaily</u>, 483 U.S. at 176; <u>United States v. Schmit</u>, 881 F.2d
608, 610 (9th Cir. 1989); <u>United States v. Gordon</u>, 844 F.2d 1397,
1402 (9th Cir. 1988).

5.   The declaration itself, together with independent
evidence, may constitute sufficient proof of the existence of the

conspiracy and the involvement of the defendant and declarant in it. <u>Bourjaily</u>, 483 U.S. at 181.

6.   The foundation for the admission of a co-conspirator statement may be established before or after the admission of the statement.  If a proper foundation has not yet been laid, the court may nevertheless admit the statement, but with an admonition that the testimony will be stricken should the conspiracy not be proved.  <u>United States v. Arbelaez</u>, 719 F.2d 1453, 1469 (9th Cir. 1983); <u>United States v. Spawr Optical Research Inc.</u>, 685 F.2d 1076, 1083 (9th Cir. 1982).

7.   Co-conspirator statements fall within a "firmly rooted hearsay exception."  Therefore, if a statement is properly admissible under Rule 801(d)(2)(E), no additional showing of reliability is necessary to satisfy the requirements of the Confrontation Clause.  <u>Bourjaily</u>, 483 U.S. at 183-184; <u>United States v. Knigge</u>, 832 F.2d 1100, 1107 (9th Cir. 1987), <u>amended</u>, 846 F.2d 591 (9th Cir. 1988).

8.   Here, the government intends to offer the co-conspirator statement of co-defendant FARAHI in the spring 2009 to his bookkeeper and co-conspirator, Elaheh Amouei, instructing Amouei not to pay a particular Nixon Peabody invoice at that time because FARAHI had already directly paid defendant in cash for these services.  The government expects that Amouei will testify to the facts of her conversation with co-defendant FARAHI about payments in cash to defendant in the spring of 2009, when she asked co-defendant FARAHI whether a particular Nixon Peabody invoice should be paid.  The government submits that this co-conspirator statement is admissible in that it was made:

(1) during the course of the conspiracy, (2) by a co-conspirator (FARAHI) with whom defendant was acting in concert, and (3) "in furtherance of" the conspiracy in that it served to enable co-conspirators FARAHI and Amouei to keep track of and monitor the cash payments that were being made to another co-conspirator, namely, defendant.  See, e.g., United States v. Emuegbunam, 268 F.3d 377, 395-96 (6th Cir. 2001) (affirming admission of co-conspirator's statements regarding payments made for conspiracy-related expenses); United States v. McClellan, 165 F.3d 535, 553-54 (7th Cir. 1999) (affirming admission of co-conspirator statements regarding arrangements of payments of currency to various members of the conspiracy); United States v. Layton, 720 F.2d 548, 557 (9th Cir. 1983) (statements made to keep a conspirator (Amouei) abreast of a co-conspirator's activities, i.e., making cash payments to defendant, are in furtherance of the conspiracy); see also Harvey v. Myers, 28 F.3d 106, 1994 WL 327562 at 2 (9th. Cir. 1994) (co-conspirator exception to hearsay rule may apply where statement was made for apparent purpose "of establishing among the conspirators who was entitled to payment and why") (unpublished Memorandum Disposition).

**F.    Business Records**

    1.    Fed. R. Evid. 803(6) excepts from the hearsay rule:

A record of an act, event, condition, opinion or diagnosis if:
    (A) the record was made at or near the time by- or from information transmitted by- someone with knowledge;
    (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
    (C) making the record was a regular practice of that activity;
    (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a

1  certification that complies with Rule 902(11) or (12) or
with a statute permitting certification; and
2  (E) neither the source of information nor the method or
circumstances of preparation indicate a lack of
3  trustworthiness.

4  2.   A document is admissible under this Rule if two

5  foundational facts are established: (a) the document was made or

6  transmitted by a person with knowledge at or near the time of the

7  incident recorded, and (b) the document was kept in the course of

8  a regularly conducted business activity.  See United States v.

9  Ray, 930 F.2d 1368, 1370 (9th Cir. 1990); Kennedy v. Los Angeles

10  Police Dept., 901 F.2d 702, 717 (9th Cir. 1990).  In determining

11  if these foundational facts have been established, the court may

12  consider hearsay and other evidence not admissible at trial.  See

13  Fed. R. Evid. 104(a) and 1101(d)(1); Bourjaily, U.S. at 178-179.

14  3.   The foundation may be established either through a

15  custodian of records or "other qualified witness."  The phrase

16  "other qualified witness" is broadly interpreted to require only

17  that the witness understand the record keeping system.  See Ray,

18  930 F.2d at 1370; United States v. Childs, 5 F.3d 1328, 1334 (9th

19  Cir. 1993).  There is no requirement that the government

20  establish when and by whom the document was prepared.  Ray, 930

21  F.2d at 1370.

22  4.   The government need not establish precisely when or by

23  whom the document was prepared; all the rule requires is that the

24  document be made "at or near the time" of the act or event it

25  purports to record.  See Ray, 930 F.2d at 1370; United States v.

26  Huber, 772 F.2d 585, 591 (9th Cir. 1985); United States v. Basey,

27  613 F.2d 198, 201 n.1 (9th Cir. 1979).

28  5.   Challenges to the accuracy or completeness of the

business records ordinarily goes to the weight of the evidence
and not its admissibility.  See, e.g., La Porte v. United States,
300 F.2d 878, 880 (9th Cir. 1962).  Because Rule 803(6)
represents a firmly rooted hearsay exception, if evidence meets
the requirements for admission under the Rule, no further showing
of reliability is necessary for admission under the Confrontation
Clause.  Ray, 930 F.2d at 1371; United States v. Norton, 867 F.2d
1354, 1363 (11th Cir. 1989); United States v. Baker, 855 F.2d
1353, 1360 (8th Cir. 1988).

    6.  Records of regularly conducted activity that would be
admissible under Rule 803(6) do not require extrinsic evidence of
authenticity as a condition precedent to admissibility if they
are accompanied by a written declaration of a custodian of record
certifying that the record (A) was made at or near the time of
the occurrence of the matters set forth by, or from information
transmitted by, a person with knowledge of those matters; (B) was
kept in the course of the regularly conducted activity; and (C)
was made by the regularly conducted activity as a regular
practice.  Fed. R. Evid. 902(11).  The government will provide
notice of the business records and declarations that it intends
to offer under Rule 902(11) well in advance of trial, and it
intends to offer numerous regularly maintained bank and other
business records into evidence based upon its having complied
with the requirements of Fed. R. Evid. 902(11).

**G.  Duplicates**

    A duplicate is admissible to the same extent as an original
unless (1) a genuine question is raised as to the authenticity of
the original, or (2) under the circumstances, it would be unfair

to admit the duplicate instead of the original.  Fed. R. Evid.
1003; <u>United States v. Smith</u>, 893 F.2d 1573, 1579 (9th Cir.
1990); <u>United States v. Leal</u>, 509 F.2d 122, 125-26 (9th cir.
1975).

**H.    Chain of Custody**

1.    The test of admissibility of physical objects connected
with the commission of a crime requires a showing that the object
is in substantially the same condition as when the crime was
committed (or the object seized).  Factors to be considered are
the nature of the article, the circumstances surrounding its
preservation and custody and the likelihood of intermeddlers
tampering with it.  There is, however, a presumption of
regularity in the handling of exhibits by public officials.
<u>United States v. Kaiser</u>, 660 F.2d 724, 733 (9th Cir. 1981),
<u>overruled on other grounds</u>, <u>United States v. De Bright</u>, 730 F.2d
1255, 1259 (9th Cir. 1984) (<u>en</u> <u>banc</u>).

2.    If the trial judge finds that there is a reasonable
possibility that the piece of evidence has not changed in a
material way, he has discretion to admit the evidence.  <u>Kaiser</u>,
660 F.2d at 733.

3.    The government is not required, in establishing chain
of custody, to call all persons who may have come into contact
with the piece of evidence.  <u>Gallego v. United States</u>, 276 F.2d
914, 917 (9th Cir. 1960).

**I.    Authentication and Identification**

1.    "The requirement of authentication or identification as
a condition precedent to admissibility is satisfied by evidence
sufficient to support a finding that the matter in question is

-47-

1  what its proponent claims."  Fed. R. Evid. 901(a).

2      2.   Rule 901(a) only requires the government to make a
3  prima facie showing of authenticity or identification "so that a
4  reasonable juror could find in favor of authenticity or
5  identification."  United States v. Chu Kong Yin, 935 F.2d 990,
6  996 (9th Cir. 1991); See also United States v. Blackwood, 878
7  F.2d 1200, 1202 (9th Cir. 1989); United States v. Black, 767 F.2d
8  1334, 1342 (9th Cir. 1985).

9      3.   Once the government meets this burden, "the credibility
10  or probative force of the evidence offered is, ultimately, an
11  issue for the jury."  Black, 767 F.2d at 1342.

12      4.   To be admitted into evidence a physical exhibit must be
13  in substantially the same condition as when the crime was
14  committed.  The court may admit the evidence if there is "a
15  reasonable probability the article has not been changed in
16  important respects."  United States v. Harrington, 923 F.2d 1371,
17  1374 (9th Cir. 1991).

18      5.   This determination is to be made by the trial judge and
19  will not be overturned except for clear abuse of discretion.
20  Factors the court may consider in making this determination
21  include the nature of the item, the circumstances surrounding its
22  preservation, and the likelihood of intermedlers having tampered
23  with it.  See Gallego v. United States, 276 F.2d 914, 917 (9th
24  Cir. 1960).

25      6.   The government need not establish all links in the
26  chain of custody of an item or call all persons who were in a
27  position to come into contact with it.  See Gallego, 276 F.2d at
28  917.

1      7.    Further, in the absence of evidence of tampering, there

2  is a presumption that public officers have properly discharged

3  their official duties.  See Harrington, 923 F.2d at 1374;

4  Gallego, 276 F.2d at 917.

5      8.    Domestic public documents under seal or certified

6  copies of public records do not require extrinsic evidence of

7  authenticity as a condition precedent to admissibility.  Fed. R.

8  Evid. 902.

9  **J.   Past Recollection Recorded**

10      1.    A memorandum or record concerning a matter about which

11  a witness once had knowledge but now has insufficient

12  recollection to enable the witness to testify fully and

13  accurately, shown to have been made by the witness when the

14  matter was fresh in the witness' memory and to reflect that

15  knowledge correctly, is admissible as an exception to the hearsay

16  rule.  Fed. R. Evid. 803(5).

17  **K.   Routine Practice**

18      1.    Evidence of the routine practice of an organization,

19  when corroborated or not, and regardless of the presence of

20  eyewitnesses, is relevant to prove that the conduct of the

21  organization on a particular occasion was in conformity with

22  routine practice.  Fed. R. Evid. 406.

23  **L.   Charts and Summaries**

24      1.    Fed. R. Evid. 1006 provides that:

25        The proponent may use a summary, chart,
     or calculation to prove the content of

26     voluminous writings, recordings, or
     photographs that cannot be conveniently

27     examined in court.  The proponent must make
     the originals or duplicates available for

28     examination or copying, or both, by other

1                 parties at a reasonable time and place.  And
                the court may order the proponent to produce
2                 them in court.

3       The Advisory Committee Notes to Rule 1006 add that:

4 "The admission of summaries of voluminous books, records, or

5 documents offers the only practicable means of making their

6 contents available to judge and jury.  The rule recognized this

7 practice, with appropriate safeguards."

8       2.   A chart or summary may be admitted as evidence where

9 the proponent establishes that the underlying documents are

10 voluminous, admissible and available for inspection.  See United

11 States v. Meyers, 847 F.2d 1408, 1411-1412 (9th Cir. 1988);

12 United States v. Johnson, 594 F.2d 1253, 1255-57 (9th Cir.

13 (1979).  While the underlying documents must be "admissible,"

14 they need not be "admitted."  See Meyers, 847 F.2d at 1412;

15 Johnson, 594 F.2d at 1257 n.6.

16       3.   Summary charts need not contain the defendant's version

17 of the evidence and may be given to the finder of fact while a

18 government witness testifies concerning them.  See United States

19 v. Radseck, 718 F.2d 233, 239 (7th Cir. 1983); Barsky v. United

20 States, 339 F.2d 180, 181 (9th Cir. 1964).

21       4.   Summary charts may be used by the government in opening

22 statement.  Indeed, "such charts are often employed in complex

23 conspiracy cases to provide the jury with an outline of what the

24 government will attempt to prove."  United States v. De Peri, 778

25 F.2d 963, 979 (3d Cir. 1985) (approving government's use of

26 chart); United States v. Rubino, 431 F.2d 284, 290 (6th Cir.

27 1970)(same).

28       5.   In addition, summary charts are admissible under Fed. R.

Evid. 611(a), which permits a court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." United States v. Poschwatta, 829 F.2d 1477, 1481 (9th Cir. 1987); United States v. Gardner, 611 F.2d 770, 776 (9th Cir. 1980).

6.   A summary witness may properly testify about, and use a chart to summarize, evidence that has already been admitted.  The court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally revealed." United States v. Shirley, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); United States v. Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983).

7.   A summary witness may rely on the analysis of others where she has sufficient experience to judge another person's work and incorporate as her own the fact of his or her expertise. The use of other persons in the preparation of summary evidence goes to its weight, not its admissibility.  United States v. Soulard, 730 F.2d 1292, 1299 (9th Cir. 1984); see Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co., 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who assisted in the preparation of the original records or the

summaries be brought to the witness stand").

**M.   <u>Cross-Examination</u>**

1.   The scope of a cross-examination is within the discretion of the trial court.  Fed. R. Evid. 611(b).

2.   Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.  The court may, in the exercise of its discretion, permit inquiry into additional matters as if on direct examination.  Fed. R. Evid. 611(b).

3.   A defendant who testifies at trial may be cross-examined as to all matters reasonably related to the issues he puts in dispute during cross-examination.  A defendant has no right to avoid cross-examination on matters which call into question his claim of innocence.  <u>United States v. Mehrmanesh</u>, 682 F.2d 1303, 1310 (9th Cir. 1982); <u>United States v. Miranda-Uriarte</u>, 649 F.2d 1345, 1353-54 (9th Cir. 1981).

4.   A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony.  <u>United States v. Black</u>, 767 F.2d 1334, 1341 (9th Cir. 1985).

5.   The scope of the defendant's waiver is co-extensive with the scope of relevant cross-examination.  The extent of the waiver is determined by whether the question reasonably relates to subjects covered by defendant's direct testimony.  <u>United States v. Hearst</u>, 563 F.2d 1331, 1340 (9th Cir. 1977), <u>cert. denied</u>, 435 U.S. 1000 (1978).

6.   Federal Rule of Evidence 608(b) provides that:

Except for a criminal conviction under Rule 609,

-52-

extrinsic evidence is not admissible to prove specific
instances of a witness's conduct in order to attack or
support the witness's character for truthfulness.  But
the court may, on cross-examination, allow them to be
inquired into if they are probative of the character
for truthfulness or untruthfulness of:
    (1) the witness; or
    (2) another witness whose character the witness being
    cross-examined has testified about.

Fed. R. Evid. 608(b).

    7.   Defendant's credibility will be crucial if he chooses to testify in order to refute the government's showing of knowledge and intent.  Indeed, because defendant is the only witness with "direct" evidence of his own knowledge and intent, if he takes the stand to deny any intent to defraud, his credibility becomes a key issue.  Accordingly, cross-examination of defendant about other fraudulent conduct in which he has engaged is necessary for the jury to weigh whether defendant's denial of knowledge and intent to defraud is credible given his other actions.  As the Ninth Circuit has held, Rule 608(b):

specifically contemplates inquiries into prior behavior
in order to challenge a witness's credibility.
Evidence of prior frauds is considered probative of the
witness's character for truthfulness or untruthfulness.

United States v. Gay, 967 F.2d 322, 328 (9th Cir. 1992).

    8.   Moreover, the prejudicial effect of such evidence, if any, can be addressed by a limiting instruction.  It is well-settled that the fact that the admission of such evidence might harm the defendant's case does not constitute unfair prejudice. United States v. Bailleux, 685 F.2d 1105, 1111 (9th Cir. 1982). Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Federal Rule of Evidence 403 Advisory Committee Note.

Thus, admission of evidence regarding the defendant's other fraudulent acts might constitute unfair prejudice if the jury in this case considered the evidence to establish defendant's propensity to commit the charged crime.  However, this potential unfair prejudice can be cured by a limiting instruction that the jury should consider the evidence only for the purpose for which it is introduced.  United States v. Hadley, 918 F.2d 848, 852 (9th Cir. 1990); United States v. Boise, 916 F.2d 497, 501 (9th Cir. 1990)

9.  As a general rule, character witnesses called by the defendant may not testify about specific acts demonstrating a particular trait or other information acquired only by personal observation and interaction with the defendant; the witness must be limited to summarizing the reputation of the defendant as known in the community.  Michelson v. United States, 335 U.S. 469, 477 (1948).

11.  On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of defendant's past conduct relevant to the character trait at issue.  Fed. R. Evid. 405(a).

12.  In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests.  Michelson, 335 U.S. at 477.

/ /

/ /

1                               **V.**

2                          <u>**CONCLUSION**</u>

3        The government requests leave to file such additional

4   memoranda as may become appropriate during the course of the

5   trial.

6   Dated: October 23, 2012          Respectfully submitted,

7                                    ANDRÉ BIROTTE JR.
                                     United States Attorney
8
                                     ROBERT E. DUGDALE
9                                    Assistant U.S. Attorney
                                     Chief, Criminal Division
10

11                                   _____/s/_____
                                     PAUL G. STERN
12                                   AARON M. MAY
                                     Assistant United States Attorneys
13                                   Major Frauds Section

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28